FILED

2007 Aug-13  AM 11:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **TERRY MOORE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **vs.** | } | **CASE NO. CV 06-B-0120-S** |
| | } | |
| **JEFFERSON COUNTY** | } | |
| **DEPARTMENT OF HUMAN** | } | |
| **RESOURCES,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

This case is currently before the court on defendant Jefferson County Department of Human Resources's ("JCDHR") Motion for Summary Judgment, (doc. 35).[1]  Plaintiff Terry Moore has sued JCDHR, alleging discrimination on the basis of gender and retaliation.  Upon consideration of the record, the submission of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment is due to be granted.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144,157 (1970).  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. V. Catrett*, 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* At 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* At 255.  Nevertheless, the non-moving party need not be given the benefit of every inference but only of every reasonable inference. *See Brown v. City of Clewiston*, 848 F. 2d 1534, 1540 n. 12 (11th Cir. 1988).

## II.  STATEMENT OF FACTS[2]

Moore, a male, was hired by JCDHR as a Social Worker I in Child Welfare in June

---

[2]Although some statements of fact are disputed, the evidence is cited in the light most favorable to plaintiff, the non-moving party, and all reasonable inferences from admissible evidence are drawn in favor of plaintiff. *See e.g., Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1315 (11th Cir. 2000).

1988.  (Doc. 41 at 3-5, 18-20.)  In March 1991, he became a Social Worker II in Child Welfare.  (*Id.*)  In October 1991, Moore was promoted to the position of Financial Support Supervisor in the Financial Assistance Office.  (*Id.*)  From 1997 until October 1998 he worked as the Financial Support Supervisor in the Jobs Office ("JOBS").  In October 1998, Moore moved back to his position as Financial Support Supervisor in the Financial Assistance Office.  (*Id.*)

Patrice Williams, a female, has worked for JCDHR since 1992, and was a supervisor in JOBS from 2000 to June 2004.  (Doc. 41 at 4.)  In June 2004, she was promoted to Program Supervisor in the Child Support Program.  (*Id.*)

In October 2004, JCDHR accepted applications for the position of Program Manager in the Financial Assistance Office ("the October 2004 promotion").  (Doc. 35 at 4.)  Williams and Moore applied for the position.  (*Id.*)

Caro Shanahan was the appointing authority for the October 2004 promotion. (Doc. 35 at 3.)  However, Shanahan, who was then the County Director of JCDHR, did not interview Moore, Williams, or any of the candidates for the October 2004 promotion. (Doc. 36, Ex. D at 2.)  Barbara Galloway, the Assistant Director for JCDHR, interviewed the candidates and reviewed the applications.  (Doc. 36, Ex. C.)  Galloway recommended Williams to Shanahan, and Shanahan concurred with the recommendation.  (Doc. 36, Ex. D at 2.)  Williams was awarded the October 2004 promotion.  (Doc. 35 at 5.)

Deborah Tarver, a female, has worked for JCDHR since 1988.  (Doc. 41 at 5.)  She was a supervisor in JOBS in Bessemer from 1999 until 2005.  (*Id.*)

In January 2005, JCDHR accepted applications for the position of Program Supervisor in the Bessemer office ("the January 2005 promotion").  (Doc. 35 at 5.)  The individual awarded the January 2005 promotion would be responsible for the Financial Assistance Program and JOBS.  (Doc. 36, Ex. G at 4.)  Moore and Tarver applied for the January 2005 promotion.  (Doc. 35 at 5.)

Caro Shanahan was also the appointing authority for the January 2005 promotion.  (Doc. 35 at 3.)  Shanahan did not interview the candidates for the January 2005 promotion.  (Doc. 36, Ex. D at 2.)  Galloway interviewed the candidates, reviewed the applications, and recommended Tarver for the promotion.  (*Id.*)  Shanahan concurred with the recommendation, and Tarver received the January 2005 promotion.  (Doc. 35 at 5.)

Moore filed an EEOC charge in January 2005, alleging that he was "denied a series of promotions . . . because of [his] sex."  (Doc. 36, Ex. AA.)  In August 2005, Tarver was demoted from the position of Program Supervisor in the Bessemer office.  (Doc. 41 at 5.)  Moore was then promoted to that position.  (Doc. 41 at 5.)  However, Moore had different duties than Tarver.  (Doc. 41 at 32.)  While Tarver had been responsible for the Financial Assistance Program and JOBS, Moore was only responsible for the Financial Assistance Program.  (*Id.*)

In January 2006, Moore filed his Complaint, alleging discrimination on the basis

4

of gender.  (Doc. 1.)  On May 23, 2006, Williams and Galloway evaluated Moore's

performance as Program Supervisor.  (Doc. 33.)  As a result of that evaluation, Moore

received a 2.5% raise.  (Doc. 41 at 35.)  If Moore had received a higher evaluation score,

he would have received a 5% raise.  (Doc. 41 at 33.)  On June 1, 2006, Moore amended

his Complaint, alleging that his evaluation score was in retaliation for his EEOC charge

and Complaint.  (Doc. 12.)  On February 1, 2007, Moore filed his Final Amended

Complaint.  (Doc. 33.)

## III.  DISCUSSION

Moore alleges three claims: 1) discrimination with regard to the October 2004

promotion; 2) discrimination with regard to the January 2005 promotion; and 3)

retaliation.  (Doc. 33.)  Because Moore has not presented any direct evidence of

discrimination or retaliation, the court uses the burden-shifting framework established by

the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  "Under this

framework, the plaintiff first has the burden of establishing a prima facie case of

discrimination, which creates a rebuttable presumption that the employer acted illegally."

*Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)  If the plaintiff

establishes a prima facie case, the burden of production shifts to the employer to

articulate a legitimate, nondiscriminatory reason for its actions.  *Id.*  If the employer

satisfies its burden by articulating one or more reasons, the burden of production shifts to

the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination.  *Id.*

## OCTOBER 2004 PROMOTION

Moore alleges that, in October 2004, JCDHR did not promote him to the position of Program Manager in the Financial Assistance Office because of his gender.  (Doc. 33 at 3.)

### Prima Facie Case

In order to establish a prima facie case of sex discrimination, the plaintiff must establish that: 1) he belongs to a protected class; 2) he was qualified and applied for the promotion; 3) he was rejected despite his qualifications; and 4) other employees who were not members of the protected class were promoted.  *See Walker v. Northam*, 158 F.3d 1177, 1193 (11th Cir. 1998).  Moore is a member of a protected class (male), was qualified and applied for the promotion, and the promotion was given to a female, Patrice Williams.

### Articulated, Nondiscriminatory Reason

Because Moore has established a prima facie case, the burden of production shifts to JCDHR to articulate a legitimate, nondiscriminatory reason for its actions.  "The defendant's burden of rebuttal is exceedingly light."  *Perryman v. Johnson Products Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983).  "[T]he defendant need not persuade the court that it was actually motivated by the proffered reasons[;] it is sufficient if the defendant's

6

evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."
*Id.* (quoting *Burdine*, 450 U.S. at 254-55). "At this stage of the inquiry, the defendant
need not persuade the court that its proffered reasons are legitimate; the defendant's
burden is 'merely one of production, not proof.'" *Id.* (quoting *Lee v. Russell County Bd.
of Educ.*, 684 F.2d 769, 773 (11th Cir. 1982)).

Barbara Galloway, Assistant Director for JCDHR, interviewed Williams and
Moore, and recommended Williams to Caro Shanahan, who was the appointing authority
for the promotion. (Doc. 36, Ex. B at 5-7, 8-9; doc. 36, Ex. C at 48-49.) According to
Galloway, "Williams was selected for the position because she was the more suited
candidate." (Doc. 36, Ex. G at 2.)

Galloway offered the following reasons for recommending Williams instead of
Moore:

> [T]aking into consideration the interview, their leadership abilities
> that they had demonstrated, their communication skills, their
> initiative. And those are all things that are in our interview outline.
> And in looking at other -- in looking at their resume, how they
> presented, how they interviewed, their evaluations in the past; those
> were factors.

(Doc. 36, Ex. C at 49.) According to Galloway, Williams "projected confidence and
enthusiasm, which would be key for community presence/impact and the State office."
(*Id.*) Galloway noted that "[r]ecommendations from supervisors and evaluations were
considered which were more favorable for Ms. Williams." Galloway cited the following
example of Williams's initiative and leadership:

7

> In the supervisory training that I did with some supervisors, she volunteered to train on one of the particular sessions that we were doing. She put it together on her own. She did an excellent job of presenting on it. Gave handouts to the group, and led the discussion and did an outstanding job.

(Doc. 36, Ex. C Part II at 11.)

Galloway was particulary impressed with Williams's interview. For example, Galloway stated that "Williams was able to explain a vision for the program and how her experience and skills would allow her to be successful," while "Moore was not able to give strong responses to those types of questions." (Doc. 36, Ex. G at 3.)

Galloway also considered Williams's performance while she was a Program Supervisor in Child Support, which is a higher level position than Moore held at the time. (Doc. 36, Ex. C at 53.) Galloway noted that Moore had DHR experience in Family Assistance and JOBS, while Williams had DHR experience in Family Assistance, JOBS, and Child Support. (Doc. 36, Ex. G at 3.)

Galloway also believed that Williams was the stronger candidate for the following reasons:

> Mr. Moore had a need for improvement in accuracy and attention to details. Mr. Moore had attended Family Assistance Basic Worker training for a second time after a case record review and at the suggestion of the consultant. Mr. Moore has weak listening skills. He does not act on all instructions given to him and he has had to retract instructions to staff.

(*Id.*) Galloway also noted that "Moore had demonstrated a need to correct information before it was reviewed by a field supervisor." (Doc. 36, Ex. G at 4.)

Through the foregoing evidence, JCDHR has clearly articulated legitimate, nondiscriminatory reasons for promoting Williams instead of Moore.  *See Burdine*, 450 U.S. at 255.  Therefore, the burden shifts to Moore to show that JCDHR's articulated reasons are actually a pretext for illegal discrimination.

### Pretext

Moore attempts to show JCDHR's reasons are a pretext for discrimination by arguing that: 1) he was more qualified than Williams; 2) JCDHR has changed its explanation for its decision; 3) JCDHR has been untruthful in explaining its decision; and 4) JCDHR deviated from its own policies in making its decision.  (Doc. 41.)

"To show that the employer's reasons were pretextual, the plaintiff must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'"  *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).  "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim."  *Id.* (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000)).

*1. Qualifications*

Moore alleges that he, rather than Williams, was the best candidate for the position.  He contends that he was more qualified because he had one and one half years of supervisory experience in the JOBS program and twelve years of supervisory experience in the Financial Assistance Program, whereas Williams had almost four years of experience as a supervisor in the JOBS program, and no experience as a supervisor in the Financial Assistance Program.  (Doc. 41 at 19.)  Moore also claims that he was more qualified because he was evaluated as consistently exceeding standards for seven out of his last sixteen years, while Williams had consistently exceeded standards for only three out of the last eleven years.  (*Id.*)  Moore also notes that he had a Master's degree in Ministry, experience in the family court system, six years of experience as a claims supervisor, and two years of experience as an Administrative Disqualification Hearings Officer.[3]  (Doc. 41 at 19-21.)

Whether or not the court concludes that Moore had superior qualifications is not the issue.  *See Cooper*, 390 F.3d at 744; *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).  While "qualifications may suffice to show pretext, . . . the 'disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected

---

[3]Moore has not explained how, or offered any evidence that his Master's degree in Ministry, experience in the family court system, experience as a claims supervisor, or experience as an Administrative Disqualification Hearings Officer were relevant to the October 2004 promotion.

over the plaintiff for the job in question.'" *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 1197 (2006) (quoting *Cooper*, 390 F.3d at 732).  The court's "inquiry is limited to whether the employer gave an honest explanation of its behavior." *Elrod*, 939 F.2d at 1470.

Galloway, who recommended Williams for the promotion, was a reviewing supervisor, and was familiar with the performance of Moore and Williams.  (Doc. 36, Ex. G at 4.)  Galloway was also familiar with Moore and Williams's performance because she "talk[s] with [her] program staff all the time about their employees," and gets "feedback about things that people are doing well [and] projects that they're working on."  (Doc. 36, Ex. C at 53.)

Galloway recognized that Moore had more experience as a supervisor, but noted that "once you reach a level of competence, and you maintain it, how many years you've been with the agency is really irrelevant."  (Doc. 36, Ex. C at 32.)  She found that, while Moore had more years of  experience, Williams had demonstrated greater leadership skills.  (Doc. 36, Ex. C at 49-50.)  Galloway noted that Moore's and Williams's evaluations were a consideration, but speaking directly with their supervisors was also important.  (Doc. 36, Ex. C at 57.)  She explained that the interviewers focus on the most recent three years of evaluations, not the applicants' entire history of evaluations.  (Doc. 36, Ex. C at 51.)  Therefore, the fact that Moore had a greater overall number of "Consistently Exceeds Standards" evaluations was not a deciding factor.

Galloway offered a number of reasons that Williams was the best candidate for the

11

position.  As noted above, Galloway believed that Williams had superior communication skills, had demonstrated greater initiative and leadership, and received more favorable recommendations from her supervisors.  (Doc. 36, Ex. C at 49; doc. 36, Ex. G at 3.) During the interview, Galloway was impressed by Williams's ability to clearly articulate specific examples of how she had displayed initiative and leadership.  (*Id.*)  For example, she led a major effort to combine child support file rooms and arranged free training for her JOBS unit.  (Doc. 36, Ex. G at 3.)  Galloway also personally observed Williams's leadership and communication skills when Williams made a training presentation and led a group discussion.  (Doc. 36, Ex. C at 61.)

Therefore, if any disparity in the candidates' qualifications exists at all, it does not rise to the level necessary to demonstrate pretext.  *See Cooper*, 390 F.3d at 745.

### 2.  Changing Rationale

Moore also claims that JCDHR has given different and inconsistent explanations for its hiring decision.  (Doc. 41 at 23.)  According to Moore, Galloway's statements in her deposition are inconsistent with JCDHR's position statement to the EEOC.  (*Id.*)

JCDHR's position statement lists a number of reasons that Williams was selected. (Doc. 41 at 16.)  Two of those reasons are that Williams "had been with the State of Alabama since 1982" and "had been with [JCDHR] since 2000."  (*Id.*)  According to Moore, "Ms. Galloway[,] in her deposition, stated that tenure was not considered in the promotion of Ms. Williams."  Galloway actually testified on this subject as follows:

Q.      Assuming that she had three and a half years of supervisory experience and he had 12 years and nine months of supervisory experience, would that be a factor *in favor of Mr. Moore*?

A.      No.

Q.      And why is that?

A.      I believe I addressed that earlier, when I said after you've demonstrated your supervisory skills, after you demonstrate your technical skills, people get on a more even playing field. I'm not sure that you -- 16, as opposed to 14, is of any significance.

Q.      And 12.9 versus 3.5?  Is that relevant or irrelevant?

A.      It depends on performance; not just the years.

                            . . .

Q.      What about tenure?  The fact that he had 16 year[s] tenure and she had 11 and a half years.  Would that make any difference?

A.      Not significant difference.

(Doc. 36, Ex. C at 50-52.)

In sum, Galloway testified that it was important to have a certain amount of experience, but that once a supervisor acquired a certain amount of experience, the exact number of years did not make a significant difference.  If Williams did not have that threshold amount of experience, she may not have been the best candidate.  Therefore, Williams's testimony is not inconsistent with JCDHR's position statement to the EEOC. Both indicate that Williams's experience was one of the reasons that she was selected for the position.

### 3.  Mendacity

Moore contends that Galloway was dishonest when she stated that certain scores on evaluations did not necessarily show "good" leadership or communication skills.

13

(Doc. 41 at 25.)  Moore notes that Galloway rated his communication skills as "exceed[ing] standards," and argues that this rating is inconsistent with Galloway's statements that 1) above standard evaluations do not necessarily reflect good communication skills or leadership, and 2) Williams had superior communication skills. (*Id.*)

First, the court notes that "Exceeds Standards" is not the highest rating for an employee's communication skills.  Second, regardless of whether or not Moore's communication skills were rated as "exceed[ing] standards," Galloway has consistently maintained that Williams's communication skills were superior to Moore's.  (Doc. 36, Ex. C.)

Moore also claims that JCDHR was dishonest by claiming in its Position Statement that the Frazer Decree prohibited them from promoting Moore from band 2 over a black employee in band 1.  (Doc. 41 at 22; doc. 40, Ex. 1.) The Frazer Decree prohibits employers such as JCDHR from promoting a lower-ranking white candidate over a higher-ranking black candidate unless the employer submits documentary evidence sustaining its finding that the higher-ranking black candidate is "unfit or unavailable." (Doc. 40, Ex. 2.)  Therefore, as Moore indicates, JCDHR could have promoted Moore over the black employee in band 1 if it had submitted documentary evidence sustaining a finding that the higher-ranking black candidate was unfit or unavailable.  However, JCDHR's Position Statement offered a number of other non-discriminatory reasons for

14

promoting Williams instead of Moore, all of which are consistent with Galloway's explanation for the decision.  The alleged inaccuracy in JCDHR's Position Statement does not establish pretext.

### 4.  Deviation From Written Policy

Moore alleges that Galloway deviated from company policy by focusing on evaluations from the past three years when analyzing candidates' evaluations.  (Doc. 41 at 25.)  Moore contends that such "deviation from company policy can be circumstantial evidence of discrimination."  (*Id.*)  Moore is correct that the failure to follow established company rules in order to benefit a non-minority applicant is evidence of discrimination. *See Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 644 (11th Cir. 1998) ("the failure to promulgate hiring and promotion policies can be circumstantial evidence of discrimination" and "it is even more suspicious where it is alleged that established rules were bent or broken to give a non-minority applicant an edge in the hiring process"); *Berg v. Florida Department of Labor and Employment Security, Division of Vocational Rehabilitation*, 163 F.3d 1251, 1255 (11th Cir. 1998) ("that inconsistent application of employment policies is circumstantial evidence of discrimination . . . may be true").

However, Moore has not presented evidence that JCDHR applied its policies inconsistently.  JCDHR's "Selection and Appointment" guidelines require the interviewer to consider "reference data, and relevant data from applications, transcripts, etc."[4]  (Doc.

---

[4]The "Selection and Appointment" guidelines do not define "reference data" or "relevant data."

36, Ex. W at 36-37.)  However, the guidelines do not state that the interviewer must weigh every performance evaluation over the span of a sixteen (Moore) or eleven (Williams) year career.  Furthermore, the guidelines do not forbid the interviewer from restricting her analysis of an applicant's performance evaluations to the most recent years. Instead, the guidelines provide certain factors that an interviewer should consider, and instruct the interviewer to make a recommendation based on those factors.  Finally, Moore has presented no evidence that Galloway has ever considered any applicant's entire history of performance evaluations rather than only the most recent three years.

According to Moore, "Ms. Galloway says that there are no guidelines for making these promotion decisions and she does them on her own."  (Doc. 41 at 25.)  However, Galloway actually stated that there was not "some kind of written policy that says you must weigh certain factors higher than others."  (Doc. 36, Ex. C at 37.)  She did not state that there were no guidelines at all.

The "Selection and Appointment" guidelines require the interviewer to consider the candidates' "performance in the interview, reference data, and relevant data from applications, transcripts, etc."  (Doc. 36, Ex. W at 36-37.)  When asked during her deposition, Galloway testified that she considered such factors.  (Doc. 36, Ex. C.)  The guidelines also require the interviewer to make a recommendation to the Appointing Authority.  (Doc. 36, Ex. W at 37.)  Since the guidelines do not require the interviewer to weigh certain factors more heavily than others, in order to make a recommendation, the

16

interviewer clearly must weigh the factors according to the needs of the particular promotion.

### Conclusion

For the foregoing reasons, Moore has not established that JCDHR's nondiscriminatory reasons were a pretext for discrimination.  Therefore, JCDHR's Motion for Summary Judgment is due to be granted as to Moore's discrimination claim based on the October 2004 promotion.

### JANUARY 2005 PROMOTION

Moore also alleges that JCDHR discriminated against him on the basis of gender when it hired Deborah Tarver for the January 2005 promotion instead of Moore.

### Prima Facie Case

Moore establishes a prima facie case as to the January 2005 promotion.  Moore is in a protected class (male), was qualified and applied for a promotion, was rejected, and the promotion was awarded to someone outside his protected class, Tarver (female).

### Articulated, Nondiscriminatory Reason

Because Moore has established a prima facie case, the burden of production shifts to JCDHR to articulate a legitimate, nondiscriminatory reason for its actions.  According to JCDHR, Tarver was "better suited for the position" for a number of reasons.

Galloway interviewed the candidates for the January 2005 promotion, and recommended Tarver to Shanahan, the appointing authority for the promotion.  (Doc. 36,

Ex. C at 9-10.)  According to Galloway, one consideration in the hiring decision was the change taking place in the Bessemer office.  (Doc. 36, Ex. C at 12.)  The Bessemer office was to become "an out-based unit rather than a freestanding program (operating independently)."  (Doc. 36, Ex. G at 4.)  According to Galloway, the "individual [awarded the promotion] would be responsible for the day to day operations of Family Assistance and JOBS in the Bessemer office."  (*Id.*)  Galloway believed that "[r]ather than pull one of the other supervisors from the other office, from a management standpoint it was prudent to utilize the skills of Ms. Tarver who was already in Bessemer and familiar with the staff."  (Doc. 36, Ex. G at 5.)  Galloway stated that Tarver "was familiar with the Bessemer staff and office operations."  (*Id.*)  According to Galloway, "[i]f Mr. Moore had been moved to Bessemer, another supervisor would have had to take on his duties in the other office."  (*Id.*)

Galloway stated that Tarver's superior communication skills were a major factor in the decision.  (Doc. 36, Ex. C at 34.)  According to Galloway, Moore "had difficulty with regard to listening, follow through, and independent thinking."  (Doc. 36, Ex. G at 4.)  On the other hand, Galloway believed that Tarver had excellent communication skills. Galloway knew of Tarver's communication skills from her personal observation of Tarver over a period of time, recommendations from other supervisors, the interview, and Tarver's written work.  Galloway had personally observed Tarver's communication skills when "talking with Ms. Tarver about a transition plan, and also observ[ing] her at

18

meetings that we had in the community, as we were working on developing providers."

(Doc. 36, Ex. C at 20.)  Galloway also learned of Tarver's communication skills through

recommendations from Peggy Comer, a former Assistant Director of the Bessemer office,

Ann Breen, the former Supervisor of the Family Assistance Program in the Bessemer

office, and Jackie White, a Program Manager for the JOBS Program, where Tarver had

worked prior to the promotion.  (Doc. 36, Ex. C at 20-22.)  Galloway testified that Tarver

"did an excellent interview in verbalizing her interests."  (Doc. 36, Ex. C at 26-27.)

Finally, she noted that Tarver's written work was accurate and clear.  (Doc. 36, Ex. C at

27.)

      Galloway believed that communication skills would be essential to the promoted

individual for the following reasons:

> [T]his is a leadership role.  Part of the person's job is to
> communicate to all staff that they have under them policy changes;
> to be attentive in the way we are operating.  They are -- they have to
> deal with disgruntled employees, with clients who are not happy.
> They have to be able to present to the community when we are
> needed.  They have to do training of your employees.  They have to
> communicate difficulties with employees on their work performance.
> So they have to communicate accurate information, in terms of data.
> So communication is a very important part of the job.

(Doc. 36, Ex. C at 38.)

      Galloway also considered supervisory feedback, which indicated that Tarver "had

the ability [to] accurately interpret policy," while "Mr. Moore had difficulties in this

area."  (Doc. 36, Ex. G at 5.)  Two supervisors, Breen and Comer, advised Galloway that

Tarver also had good relationships in the community and with her staff.  (Doc. 36, Ex. C at 21-22.)

Through the foregoing evidence, JCDHR has articulated legitimate, nondiscriminatory reasons for awarding Tarver the January 2005 promotion.  Therefore, the burden shifts to Moore to show that JCDHR's articulated reasons are a pretext for unlawful gender discrimination.

### Pretext

Moore attempts to show pretext through the following arguments: 1) he was more qualified than Tarver; 2) JCDHR has changed its rationale for the decision; 3) JCDHR has been untruthful in its explanation for the decision; and 4) "referring to Mr. Moore as a 'lady' in her memos to all of the comparator supervisors" is circumstantial evidence of sexual discrimination.[5]  (Doc. 41 at 26-30.)

#### 1. Qualifications

As previously mentioned, while "qualifications may suffice to show pretext, . . . the 'disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'"  *Ash*, 546 U.S. at 1197 (quoting *Cooper*, 390 F.3d at 732).  The court's "inquiry is limited to whether the employer gave

---

[5]Moore also incorporates his "deviation from company policy" argument set forth in his discussion of the October 2004 promotion.  That issue is addressed in the "October 2004" section of this Memorandum Opinion.

20

an honest explanation of its behavior." *Elrod*, 939 F.2d at 1470.

Moore notes that he has a Master's degree in Ministry, but fails to explain why that Master's degree would be more useful than Tarver's B.S. degree in Social Work and Criminal Justice to a Department of Human Resources.  (Doc. 41 at 26.)  Moore argues that he has more experience than Tarver.  (*Id.*)  However, Galloway explained that "once you reach a level of competence, and you maintain it, how many years you've been with the agency is really irrelevant."  (Doc. 36, Ex. C at 32.)  Therefore, Galloway found that Moore's additional years of experience were a factor, but not a deciding factor.  (*Id.*)

Moore fails to address JCDHR's perceived need for a supervisor familiar with the Bessemer office or Galloway's belief that Tarver possessed superior communication skills, which she deemed crucial to the position.  Consequently, any disparity between the candidates' qualifications does not rise to the level necessary to show pretext.

### 2.  *Changing Rationale*

Moore argues that "Galloway's reasons for promoting Ms. Tarver are completely different than the reasons listed on defendant's position statement."  (Doc. 41 at 27.)  While Galloway offered additional reasons for the decision, those additional reasons are not inconsistent with JCDHR's position statement to the EEOC.  (Doc. 40, Ex. 1 at 3; doc. 36, Ex. C; doc. 36, Ex. G.)  Moore has not cited any authority that an employer can only articulate nondiscriminatory reasons that were mentioned in the employer's position statement, which is written before any discovery has taken place.

### 3. Mendacity

Moore contends that Galloway has been dishonest in explaining the reasons for her decision.  (Doc. 41 at 28.)  However, Moore does not cite a single instance of Galloway being less than completely truthful.

For example, Moore complains that "Galloway said that she promoted Ms. Tarver because she had been in the Bessemer office for several years," but "Galloway had transferred Ann Breen to the same job in the Bessemer office and she had never been there at all."  (Doc. 41 at 28.)  Moore also notes that another program supervisor was promoted over Moore in Birmingham despite being from Tuscaloosa.  (*Id.*)  However, Galloway never stated that she always promoted individuals already working in a given location.  She stated that, given the changes taking place in the Bessemer office, it would be beneficial to hire someone with knowledge of the Bessemer office's staff and policies.  (Doc. 36, Ex. G at 5.)

Moore also alleges that Galloway "says that she promoted Ms. Tarver because of her . . . communication," but "she must have liked Mr. Moore's communication as well because she gave him an 'exceeds standards' in communication in his evaluation."  (Doc. 41 at 28.)  The fact that Galloway rated *Moore's* communication as "exceeds standards" does not mean that *Tarver's* communication skills were not a factor in Williams's decision.

Moore notes that "Galloway says she got a reference from Ms. Comer in favor of Ms. Tarver," but "did not ask [Moore] for a reference during the questioning." (Doc. 41 at 31.) Again, Moore's allegation does not indicate dishonesty. Furthermore, Moore actually stated that she "sought out" Comer in order to obtain her opinion. (Doc. 36, Ex. C at 22.) Galloway never stated that she asked for, or received, a reference during the interview. Therefore, Moore's allegations of dishonesty do not establish pretext.

### 4. Sexual Comments

Moore alleges that "referring to Mr. Moore as a 'lady' in [Patrice Williams's] memos to all of the comparator supervisors is a sexual comment and can be considered as circumstantial evidence of sex discrimination." (Doc. 41 at 30.) Even if the words "Hello Ladies" in an email sent to three females and one male could be considered circumstantial evidence of sexual discrimination, there is no evidence that the email's author was a decisionmaker or that any decisionmaker had knowledge of the email.

### Conclusion

For the foregoing reasons, Moore has not established that JCDHR's nondiscriminatory reasons were a pretext for discrimination. Consequently, JCDHR's Motion for Summary Judgment is due to be granted as to Moore's discrimination claim based on the January 2005 promotion.

## RETALIATION

Moore also claims that JCDHR retaliated against him in response to his EEOC charge, filed in January 2005, and his Complaint, filed in January 2006.  (Doc. 33 at 2.) According to Moore, JCDHR retaliated against him by reviewing his performance at a higher level than his predecessor, Tarver.  (*Id.*)

### Prima Facie Case

To establish a prima facie case of retaliation, a plaintiff must show that: 1) he engaged in statutorily protected conduct; 2) he suffered an adverse employment action; and 3) the adverse action was causally related to the protected expression.  *Farley v. Nationwide Mutual Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999).

Moore engaged in statutorily protected conduct in January of 2005 when he filed an EEOC charge and in January of 2006 when he filed this action.  (Doc. 33 at 2.)  Moore alleges that he suffered an adverse employment action when Galloway and Williams reviewed his performance at a higher standard than similarly situated female employees. (Doc. 33 at 2-3.)  Moore alleges that, as a result of raising the standard, he received a lower score on his evaluation.  (Doc. 33 at 2.)  As a result of the lower score, Moore received a 2.5% raise instead of a 5% raise.  These facts constitute an adverse employment action.  *See Gillis v. Georgia Dept. of Corrections*, 400 F.3d 883, 887 (11th Cir. 2005) (an evaluation that resulted in the plaintiff receiving a 3% "met expectations" raise rather than a 5% "exceeded expectations" raise was an adverse employment action).

24

The court will also assume that Moore has established that the adverse action was causally related to his protected expression.  The causal link element is construed broadly so that "a plaintiff merely has to prove that the protected activity and the . . . [adverse] action are not completely unrelated."  *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998).  "A plaintiff satisfies this element if she provides sufficient evidence of knowledge [of the decision makers] of the protected expression and that there was a close temporal proximity between this awareness and the adverse action."  *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (internal citations and quotation marks omitted).  "A close temporal proximity between the protected expression and an adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case."  *Id.*  However, "the Supreme Court has stated that 'mere temporal proximity between . . . knowledge of protected activity and an adverse . . . action . . . must be very close.'"  *Id.* (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).  "The Court cited with approval decisions in which a three to four month disparity was found to be insufficient to show causal connection."  *Id.*

It is undisputed that the decision makers, Williams and Galloway, knew of Moore's charges of discrimination.  (Doc. 36 at 75.)  Moore's EEOC charge, filed in January 2005, seventeen months before the May 2006 evaluation, is clearly too remote to establish a causal connection.  His Complaint, filed in January 2006, five months before the May 2006 evaluation, is by itself too remote to establish a causal connection.  *See*

25

*Higdon*, 393 F.3d at 1221 ("By itself, the three month period between the September 29 letter and the December 31 incident does not allow a reasonable inference of a causal relation between the protected expression and the adverse action.").

However, Moore does not rely solely on temporal proximity.  The performance evaluation standards were changed between the time that Tarver was last evaluated (before being demoted) and the time that Moore was first evaluated (after being promoted).  (Doc. 40, Ex. 25-26.)  Tarver's evaluation form judged her ability to perform two tasks with "few exceptions," and three tasks with "no exceptions."  (Doc. 40, Ex. 26.)  Moore's evaluation form judged his ability to perform all five of those tasks with "no exceptions."  (Doc. 40, Ex. 25.)  Because Moore's performance evaluation standards were slightly altered, and the causal link element is "construed broadly," the court will assume that Moore has established a prima facie case of retaliation.

### Articulated, Nondiscriminatory Reason

JCDHR has articulated non-discriminatory reasons for Moore's evaluation.  First, JCDHR contends that "the amount of his merit raise was due to his performance as a Program Supervisor and not based upon his gender."  (Doc. 35 at 11.)  Second, in response to Moore's complaint that he was evaluated according to different standards than his predecessor, JCDHR notes that Moore was overseeing only the Family Assistance Program, while Tarver had been responsible for the JOBS Program and the Family Assistance Program.  (Doc. 36, Ex. C at 86.)  Galloway stated that the evaluation

26

forms were updated to reflect this change in responsibilities.

## Pretext

Moore has offered no evidence of pretext other than his prima facie case.[6]  His prima facie case is by itself insufficient to rebut JCDHR's legitimate, nondiscriminatory reasons.

## Conclusion

Because Moore has not established pretext, JCDHR's Motion for Summary Judgment is due to be granted as to Moore's retaliation claim.

## IV.  CONCLUSION

Therefore, upon careful review of the record and the arguments presented in the briefs of the parties, the court concludes that there are no material facts in dispute and defendant is entitled to judgment as a matter of law.  An order granting defendant's motion for summary judgment will be entered contemporaneously with this Memorandum Opinion.  Defendant's Objection to Plaintiff's Exhibit List, (doc. 42), is **DENIED** as **MOOT** by entry of Summary Judgment in defendant's favor.

**DONE**, this the 13th day of August, 2007.

*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE

---

[6]Moore concedes that Tarver was responsible for two programs, while he was only responsible for one.  (Doc. 41 at 32.)